Case number 14-1103 et al. TransCanada Power Marketing Ltd. Petitioner v. Federal Energy Regulatory Commission. Mr. Wiseman for the petitioner, Ms. Banta for the respondent. Ms. Banta for the respondent. May it please the Court, Kenneth Wiseman for petitioners, and I reserve five minutes for rebuttal. FERC's two core rulings in this case, the ruling concerning cost allocation and the ruling that accepted as-bid prices as just and reasonable, unnecessarily and we submit unlawfully, increased consumers' electricity costs. I'd first like to address FERC's decision to allocate the costs of ISO New England's winter reliability program to load-serving entities rather than accepting ISO New England's proposal to allocate those costs to transmission owners. FERC conducted no analysis to determine whether ISO New England's proposal to allocate the program's costs to transmission owners was just and reasonable, and it made no conclusion that the allocation methodology proposed by ISO New England was unjust and unreasonable. But instead of allocating the costs to transmission owners, which is, we submit, required under this Court's precedent, FERC allocated the costs to load-serving entities, and it did that on two bases. One, it said that it allocated the costs of the predecessor program in 2005-2006 to load-serving entities, and secondly, it said that cost causation principles purportedly supported the allocation of costs to load because load is the beneficiary of the costs and it requires the, it causes the incurrence of the costs. Both of those rulings are in contradiction of this Court's longstanding precedent, and the latter ruling is in contradiction of the facts. This Court said in Atlantic City Electric Company v. FERC, Cites 295F3-1, and the specific discussion is at page 9, that under FBA Section 205D, when a public utility proposes to change the rates, to change its rates, FERC can reject the utility's proposal only if it finds that the proposal is unjust and unreasonable. In City of Bethany v. FERC, this Court said that FERC is only to determine whether the proposed rates are just and reasonable. Is your point that it didn't use the words just, unjust, and unreasonable? It's not. It certainly did not use the words, but our argument is. We've never said FERC has to say that. I'm sorry, Your Honor. We've never said that FERC has to use the magic words, right? You have said that FERC doesn't have to use the magic words, but here it didn't conduct the analysis. But here it said that, as you pointed out, that ISO's proposal violated principles of cost causation. And it didn't analyze. I'm sorry, Your Honor. What's the problem with that? The problem is that FERC didn't actually analyze the argument that was made to show why its decision, in fact, was inconsistent with cost causation principles. We had argued to FERC that what happens under its methodology of allocating the cost to load-serving entities, that load-serving entities would not have the ability to pass through those costs to load because load-serving entities have fixed-rate contracts. When a surcharge comes out of the blue after 10 years, they can't simply renegotiate their contracts, their existing contracts. Right, but didn't FERC say that, fine, that these would be built into future contracts in terms of risk premiums? And that's the two-fold problem. First of all, with respect to the costs of the 2013 program, instead of load, which is the cause of the costs and the beneficiary of the costs absorbing those costs, they escape those costs. But in the long run, directly to your question, what happened is that now load-serving entities have to include risk premiums. And that's exactly what FERC wants. It thinks that's the most equitable way to pass along these increased costs. Well, but what it's passing along in some instances are non-existent costs as a result. If you think about this, it's kind of like an insurance policy. Exactly, but wouldn't you be on, I mean, wouldn't the load-serving entities be on notice since this is New England, and in particular since the 2005-2006 experience that this kind of thing arises, and that's a risk that they would have to self-insure against? Well, again, first of all, from the time of 2005 until this program in 2013, there were no surcharges of this kind. So whatever notice was provided in 2005, I would suggest to you that if load-serving entities had included this risk premium in their rates for that eight-year period, load, meaning consumers, would have been paying for nothing. No, I mean, we all know how insurance works. You're going to give a small buffer against it, and over time, then it comes up 10 years later, and they paid more during the warmer times, and then they pay less during the colder times. And that's the nature of a long-term contract, right? But there's a distinct difference here in that this is a regulated industry where the entities that were making the sales, in this instance, the generators, they're regulated by FERC. They are permitted to charge only just and reasonable rates, and when they then charge whatever they're going to charge, the load-serving entities take that charge, and they're effectively taking the costs they incur and passing them on to rate payers with, obviously, a profit margin. But in this instance, if the costs had been allocated to transmission owners, then the rate payers would have paid much less because they don't have to absorb these risk premiums in prior years because of the guaranteed right of transmission owners to pass through the costs under Notte-Halle v. Thornburg and Narragansett v. Burke. So we'd submit to you that actually FERC didn't complete the—it said it applied cost causation principles, but it didn't conduct—it didn't analyze the facts in this case. Well, it did. They said the costs should be allocated to those who benefit from the incurrence of the cost and the user. I mean, I understand your quibble. If I'm on your side, it's pretty easy to argue. You're arguing, essentially, that it's harder for you to collect from the end-user than the transmission folks. Yeah, that's fine, but that doesn't result in a win for your position because FERC did justify what it had done, and if you have to have an insurance-type premium going forward, so be it. Well, you know, this Court has said that you can't just pluck a rate out of thin air, and that's effectively what FERC does. No, no, no, that's your second argument. I'm sorry? Well, I agree, but I think it relates to this as well. The allocation argument, I mean, you're really climbing a high hill, at least as far as I can see. Your second argument's a different argument. You're mixing them up. Okay, well, let's go put aside the cost side of it for now, and let's just talk about the allocation. Again, FERC's justification was, well, it said we dealt with this argument back in 2005. Well, if you go back to the 2005 order, you'll see that, first of all, there was most certainly a similar argument made, but it wasn't identical. Wait, are you still talking about the allocation? I'm talking about the allocation. No, no, what about the reasonableness of the rate argument? Oh, I'm sorry, the reasonableness of the rate itself? The allocation argument, you're running much to the right. In terms of the reasonableness of the rate, there was no record. There was no record evidence taken at all. We knew that it was established by ISO New England that it estimated the costs of the program at $16 to $43 million, and that later on it acknowledged that that actually didn't include risk premiums and profit margins for the suppliers. When the bids came in, they were at $78.8 million for 83% of the targeted level of service. So ratepayers ended up paying, depending upon how you look at the range of costs, 1.8 to 5 times the original estimate without any evidence of what costs went into that calculation of the $78.8 million. Is there any knowledge analysis that, well, the bidding was competitive, so the request for profits must have been reasonable? You didn't buy that? Well, no, because there was no – you know, it's very interesting, I think, that the – FERC said that the product that's being delivered here is unique in each instance, because the suppliers are at different locations, they're providing a different level of service, and that justifies a different rate for each of those suppliers. Well, I'll accept that as a given. If that's a given, then you have to make a determination of whether each of those sellers has market power. There was no determination here. Wasn't this an auction? No. Well, they bid – suppliers bid in, but they could bid, but they were taken at their asking prices. Suppose FERC had simply said – had simply expressly applied the Mobile Sierra doctrine to this. It said this is an auction, cited New England Power Generator, and said it satisfies Mobile Sierra. Would you have been satisfied with that? No, because still – FERC still didn't – It didn't do that. I wouldn't say it didn't do it, but would you – suppose it did do that. What would be the problem with that? Well, I think had it done that, you'd still have to go backwards and determine, well, is the program itself just and reasonable such that even under Mobile Sierra that these contracts should be adhered to? But that's not the question under Mobile Sierra. Well, okay, reverse it. The answer would be, does the public interest require rejection of these contracts in this instance? And I'd say yes, because there was never an investigation. There's absolutely no evidence to determine that these sellers didn't individually have market power and charge prices that were dictated by their market power. If the burden is flipped, though, under Mobile Sierra and you're saying it's contrary to the public interest, isn't it your – as a challenger, your burden to say there is market power and let me show you why or there's at least a reason to fear that there's market power? Is there any – I mean, can't you just sketch out that concern? Of course, we tried to make the argument. We made the argument based upon the evidence that was available to us, and FERC shut us down and said no. We actually asked for an evidentiary hearing, I believe. FERC said no, this is just and reasonable, and it just moved on. So we dealt with what the evidence was that we had available to us. We would have liked to have developed more. I can see my 10 minutes is up. But could you – I mean, it would be useful if you would sketch what you think or what – I mean, even if there's not evidence in the record, what is the basis for concern that these as-bid prices reflect market power, given that if you look at the record, there were many different suppliers opting to put forward bids. In fact, they first offered terms that weren't attractive enough. They didn't get enough bids. When they did offer terms that were attractive enough, they got a bunch of bids. They saw the curve. They said we're not going to buy the most expensive of these. We're going to buy the less expensive. We're also going to look at reliability and location. And do we have any reason to believe, for example, that there was collusion among those bidders or that there's market power, that there's not a competitive market there? I don't – there's certainly no evidence of collusion, and we never made an allegation of that sort. But there was evidence of a cost estimate of $16 to $43 million. And there is evidence that suggests that the excess was due to risk premiums and profit margins. So since there never was an analysis of whether individual sellers had market power, I think there's certainly reason to believe that that possibly was exercised in this instance. And our concern is that load-serving entities are the ones that had to absorb the cost of that 2013 program because of their fixed-rate contracts. They couldn't pass those costs on to load. And so – So it's just – the idea is, I mean, if you're bidding for something that you want, and I gather that a lot of these bidders were somewhat ambivalent about what they really wanted to provide here, but to the extent that they're putting in a bid, you're assuming or hypothesizing that it's possible and it needs to be investigated whether they are bidding high to get more of a risk premium and more profit, even though they might then not be selected, and that somehow the whole group of them is doing that, is gouging the public by – because, I mean, typically you have, as a bidder – I mean, this is why auctions work – you have an incentive to say, well, I want a bid high enough to get my profit margin on my risk, but I don't want a bid so high that I'm in that right hand of the curve and I'm not going to get the business, and that's the discipline. And the question is, why isn't that discipline working here? And I understand your point about the estimate and then the prices as they came in, but just structurally, I want to understand your case. Sure. The reason that's not working is that generators in this instance are obviously located at various places all across the ISO New England grid, and to provide reliability, it's simply not a matter of any generator at any time generating power. It's a matter that there are certain places on the system where that power is needed. So if a power – if a generator was located in a specific location, which is known to be subject to reliability problems, that generator could go into this bidding process knowing more or less with some certainty that it was going to get selected regardless of what price it charged. So did generators charge – did every single generator take advantage of that potentiality? Probably not. I don't have any evidence of that. But did some? Very possibly. And that's what FERC should have investigated and didn't. Okay. Thank you. Thank you. Good morning. I'm Carol Banta for the Commission. I'd like to begin by picking up on this last point, Judge Pillard, and looking at exactly what the Commission saw when the bid results came in. At JA605, there's a footnote in the bid results – I think it's the first bid results order – noting that the ISO had explained that the accepted bids, 43% of the bids that came in, I think, not just 43% of the accepted bids, but 43% of the bids that came in were less than $10 per megawatt hour. 25% were between $10 and $20, and 20% were between $20 and the $31 cutoff point. That's sort of a numerical expression of the graph that was in our brief and that's also in the bid results. So the Commission said in its orders that this was a competitive bidding process. The ISO had said from the start that it expected it to be competitive. It didn't expect – the ISO had said in its initial filing we expect this to be competitive, and I don't think there was ever any dispute about that. Well, typically when you are saying this is market-based, these rates are market-based, there has to be some finding as a predicate to going that route of finding that the market is competitive, that there's no market dominance, and I don't see that. I see general statements about need and bidding, but that typically hasn't been enough, and I don't see any case that really supports this kind of thin market, this kind of thin record, on just the FERC saying we're confident that it's competitive. Well, and the Commission did not say it was market-based, and of course was a novel approach, and the Commission didn't think it was a model for the best way to do this going forward. It was an interim program that was urgently needed. So the Commission – it's kind of a hybrid. It was not market-based in the way the Commission uses that term and approves a market and then lets it run. It also was looking at – the ISO had discretion, for instance, discretion not to buy the full amount. That was one way to keep costs down, and in fact the ISO did decide to buy less than the full amount approved, and the Commission noted in the bid results order that the ISO had been trying to keep the costs down. So it had some market characteristics, like a competitive bidding process, the criteria that were tailored very much based on the reliability needs that were to be met, with the ISO exercising a lot of discretion to choose more reliable resources over ones that offered fewer benefits, but also to keep the costs down. I understand. Go ahead. Go ahead. You go ahead. Go ahead. Did you have a follow-up question? No, go ahead. Go ahead. The thing that bothers me is that the other side is making a perfectly legitimate argument that we can't figure out how much is attributable to profit and risk markup, which presumably you're supposed to say something about, because it's clearly a question here. So when I'm preparing a case, I understand what the challenge is, and I'm looking for the agency's explanation, and their explanation in response to that. Under a competitive as-bid program in which resources are selected based on both price and non-price factors, it's reasonable that participants with greater reliability benefits will be paid higher prices, and the record in this case does not persuade us that participants included excess profits unrelated to actual risks and costs in submitting their bids. And I say, well, that's interesting. What else? There's nothing else. There's absolutely nothing else. It's totally conclusory, and they're not pointing to anything to support the suggestion. Now, if they had played it out and explained that. I would add to that that earlier in that paragraph the commission said it also was looking at the total cost of this program and balancing it against the need to do something. Where did it actually do that? Where did it do that? That's what I couldn't find. Where did it do that? I think that this paragraph 15 is where the commission said we looked at the overall cost of this and we're okay with this for the purpose of keeping the lights on in New England for three months. And this did turn out to be a winter in which 88% of the oil procured under this program was burned. It was the polar vortex winter. These decisions are being made in, now we're looking now at the bid results for hearing order, which happened after the fact in April when the commission knew what had happened. But the tariff was approved in September. The bid results were approved in October. The oil tanks had to be filled by December 1st. So this was all being done on an extremely fast timeline. And the ISO had put together a program that. But FERC still, even if the circumstances were extraordinary and the timeline short, FERC still had to make the ultimate determination in some way that this ultimate cost was just and reasonable. And it did decide that the $75 million ultimate cost was the reasonable cost of addressing these reliability concerns. See, what I saw was, I had a slightly different question from Judge Edwards, I see his point, which is that I thought the commission's response to the petitioner's argument here was that, you know, was that the commission had looked at each of these individual contracts. And they were all okay. But I didn't, I never saw anywhere where the commission concluded that the overall cost of the program was just and reasonable. And he added them all up that the result was just and reasonable. If you didn't use Mobile Sierra, you could have, the commission could have done that. But it didn't do that, right? It didn't do that, no. And why wasn't this reviewed as an emergency program? I notice there's a provision for that, and it's not looked at that way. It wasn't looked at as the, under the abbreviated cost-based showing. I mean, how do you categorize this program? I guess that's another question. I mean, we have to review it, you have to review it. You're basically saying here are some characteristics of the situation, here are some characteristics of the program, trust us. Well, it's not quite trust us. It is a hybrid approach because the commission was looking at the overall costs rather than each individual contract. That's true. And it had market-like aspects like the competitive bidding. But the commission was looking at it as a rate design. It did refer to it as a rate design in paragraph 21 of the tariff-free hearing order. And it was just putting together, and again, I don't want to rush past the considerations that it emphasized numerous times in the orders about the reliability needs, the urgency of the approaching winter, the temporary nature of the program, as well as the prospective costs as much as they could be estimated in advance. In the rate design, it had the competitive bidding, the acknowledgement that non-price factors, that a resource with better turnaround time, a better history of reliability in terms of outage percentages, location in one of the heavier load pocket areas would be worth more money. And the criteria that the ISO would apply, again, the cap on the total that the ISO could buy, as well as its discretion to buy less than that. The commission really did look at this as a package of measures that, taken together for the purposes of this short-term emergency program, with the commission reviewing it as well, was just reasonable. So why not ask for cost data? I mean, the bidders presumably had their cost data. They had to have it to put together the bids. And yet, it's not in the record. They were not asked to submit that with the bids. See, they're setting a standard for themselves. That's what affects my thinking right away. In writing what I read to you before, they're saying that the participants could not include excessive profits unrelated to actual risks and costs. They're saying, they're acknowledging, in effect, in their judgment, that would not be permissible. And then they're saying, well, our look at the record suggests they did not. And I'm saying, where? How do you reach that conclusion? In other words, don't you agree they are saying there cannot be excessive profits unrelated to actual risks and costs, right? Right. Okay. How do they prove that point? How do they show me that, indeed, all they say is the record doesn't show it? Well, because it doesn't. Because if you look at it, look. But you have to explain to generalist judges what you're talking about, the expert agency. When you reach that conclusion, what are you basing it on? What are they basing it on? They're basing it on, right. They're basing it on, they're looking at how this actually played out. Again, the graph, and what I said, 68% of the bids came in under $20. 43% of them were under $10. So there wasn't a rush to the top. The ones at the top, they bid too high. They got cut off, which they didn't know was going to happen because the ISO had the discretion to cut off at less than the total. It didn't say that it would. It didn't say where it would. It made that judgment based on the break point that it saw in the graph. But that's not alone enough. I mean, if there are three of us bidding for something, and we know that the demand is for, you know, the amount equal to what two of us could provide, we've got a lot of market power. And we can say, well, you know, I may be cut off, but, gee, I'm going to shoot high because I've got market power here. And we just don't have any record. I mean, you're asking us to assess this as a court. And I don't even know what standard you're asking us to look at. What do we have to find? Cost? Do we have to find market power? No. No. What do we have to find? Well, I think, again, it was a hybrid approach, which is what makes the standard difficult. So what's the new standard? If we were going to go gung-ho, we see this brave new world, what standard do you propose that we apply? The showing needed in a hybrid situation like this going forward is what? I think, well, the commission just didn't see evidence that something. Let me just modify Judge Pillard's question because, to me, she just got to the core of it for me, too, which is not what do you propose, but would you point to language in the commission's order which explains the methodology they used? That's what we're looking for. What explains the methodology the commission used in this case and its ultimate judgment that the cost it was imposing was just a reason? Where do you find that in the order? Well, it could be clear. It could. Right. I know. I know. So what would you point to that's unclear that could be clear? Give us the best language in the order you have. So when we go back and talk among ourselves, we're looking at the part of the order which you think most persuasively explains the answer to Judge Pillard's question. Well, I think, I mean, the core of the holding is in the tariff-free hearing order in 15 through 18. And what particularly in 15 through 18 would you point to? Do you want to use my background? No. There are several places that I wanted to point to, and I don't know whether I found the best one. This is in the re-hearing order? Yes. And I think the commission was looking, is looking at this bucket of factors and the criteria that were based on the reliability, the discretion given to the ISO, and the inability to know in advance what the actual cost would be, but that, I think, in paragraph 21. Okay, so we go back. These are the three paragraphs, right? These are the ones you, the commission lives or dies on, these three paragraphs. Well, I think they're probably. 15 to 18? Probably not. I mean, I also, it's in several places because the commission was grappling with this over several. Tell us where. Every place you want us to look at. Every place. Again, don't tell me the whole order. No, no, no. In the first order, in the tariff order. Yeah. There's paragraph 31 and 32, where the commission is talking about what this design entails, with the ISO having discretion, what the factors are going to be, and looking at. JA, I'm sorry. Oh, I'm sorry, JA 471 and 472. And in paragraph 32, it's talking about there being a cap on how big this program is even allowed to be, with the ISO having discretion to go lower. And it refers, I mean, the commission's focusing, rather than on the individual bids that might come in, because it does understand that this is expected to be a competitive bidding process, it is focusing on the total cost. And that is how it looked at this program, what is going to be the total cost of providing this reliability. And again, it doesn't hold this up as a model for, or an approach going forward. They weren't capping the cost. They were capping the amount. They were capping the amount, because they couldn't be sure of the cost. I mean, they were not attending to the cost at all. No, they were attending. You've got one estimate, which turned out to be terribly low, and then a much higher figure. The commission, as far as I can read the record, was not attending to cost. They were attending to quantity. Well, quantity as a sort of proxy for cost. The commission's talking about total cost in paragraph 32. See, that doesn't make sense to me. How can quantity be a proxy for cost? Except in the sense that the quantity you're talking about is very limited, but the rate within is incredibly high. It gets worse the higher the quantity. That's true. But you still have to figure out, whatever the quantity is, you still have to figure out whether the rate attributable to it is reasonable, right? And they said, indeed, they were going to do that. And the same question pertains there. When they did that, when they reviewed the actual bids accepted, what was the standard that should assure us and assure the public that there was actual scrutiny of anything? That you had a tool that you were using to say, well, you know, here we were with a special purchase, and ISO New England said, you know, we may opt to purchase less than the full amount if costs are very high. And then you're looking at it after the fact, and you're saying, well, did they make the right judgment there? You know, did they draw the line between high and very high in a place that is just and reasonable? What tool, what standard did the commission use there? I don't think there's a tool that it set up. I think it looked at the graph with the breakpoint. It looked at the number of megawatt hours. You know, the ISO didn't buy the full amount, which would have been much more expensive. But that $31 breakpoint, it justified, and again, 31 was only the top. Most of the bids were far lower than that. But it justified that breakpoint by looking, if we went a little lower, you spend a little bit less and lose a lot more reliability. If you go a little bit higher, you spend a lot more for a little bit of reliability. In addition, on the next page in the bid results, the ISO said that that level of megawatt hours, which was about 200, correlated with about when mid-season replenishment had happened in previous years. So there were multiple justifications for buying that number of megawatt hours. And I think the commission looked at it, the total after a couple of adjustments for generators that made mistakes was $75 million. And because the bids mostly were at the lower end and didn't show some massive, some pattern of being especially high, I don't think there's, I don't think we know, we have the list of which generators got which amounts of money, but I don't think we have the information on which ones were in which regions to suggest whether they had been bidding higher or not. On the question about reliability, I was actually a little bit confused by that in terms of geography. I know the record does refer to where different generators are located, but I thought one of the distinctive aspects of the power grid was precisely that it doesn't so much matter where you are. I guess it matters because the line goes down between Nantucket and, you know, West Lowell, and so you get cut off. And I know there's some discussion of that in the record, and I don't remember what it is now, that when they were looking for some geographic diversity, they were kind of, I think they were assuming a worst-case scenario where a lot of things are going wrong, I think. So what's typically an integrated grid becomes broken sub-pieces for a period of time, and that's why it's good to have generation going on at diverse locations. I think that's right. Now the commission, the ISO did not ultimately, because the bids broke out in that graph a certain way, it did not end up substituting a more expensive, more reliable resource for a less expensive one, because geographically they had broken out the way they needed to, so that there were substantial resources in the eastern Massachusetts and Connecticut areas, which are the heavier load pockets. I do want to point out also that there were, although there were 20 generators that participated in the program, the selected bids were actually 56 generating assets as well as three demand response. So it was not the hypothetical of three, for example. One last, well, maybe the last question, my last question. We were talking about Mobile Sierra a little while ago. Do you know why the commission didn't simply do what we said it could do in New England, power generator, and treat this capacity auction and apply Mobile Sierra to its contract rates? I don't know. No, sorry, go ahead. Yeah, that's exceeding my knowledge on this, unfortunately. I do know that in the future, one reason this was an interim process is that a few years out, New England is introducing a capacity performance auction. I don't know how it relates to Mobile Sierra exactly, but it will attach, I think, different payments and also penalties for non-performance in, for instance, winter. Yeah. So I know that that's why this was an interim program. Anything else? I'm fine. Okay, thank you. Don't need to hear about allocation then. No, we're okay with that. Okay, thank you. Let's see. Mr. Weisman, I think we used up all your time, so you can take two more minutes. Thank you. I have very limited rebuttal. I just want to make one point. Council was discussing the fact that the bids came in at $10 and $20 and $30, and at least my take on the commentary was a suggestion that those were all in a very low range as compared to other bids that were significantly higher. But it has to be remembered that these suppliers were being paid for capacity separate from this program. They were being paid for energy separate from this program. They were being paid for ancillary services separate from this program. Basically what they're being paid for here is to procure oil. And so in that context, the difference between $10 per megawatt hour and $31 per megawatt hour is actually very significant, and it's in fact what drove this price up from an original cost estimate of $45 million max to almost $80 million. Can you break that down a little bit? I've been wondering about that. How does the program work, and what are these payments accounting for? So let's say it's a year where I've been a successful bidder and I've offered to provide this reliability service, and it turns out to be warm, and the ISONE doesn't need the service. Am I being paid anyway, and what am I being paid for if I'm not a dual fuel, I'm just an oil-based provider? Yes, my understanding is that you put in the bid, you were paid, and that was how the program was designed. What am I paid? What am I paid for? Whatever your bid was. Whole thing, so they don't use it. Right, because remember the way the program was designed, and this gets back to the allocation issue, the commission said to the load-serving entities, well, you need to pass through those costs now. That's at your risk. Well, so the commission defined, here's the cost, $78.8 million. We're not saying that service is going to be provided or not be provided. It's up to you to know it. Go collect that from your customers. I thought if they didn't need it, there was this provision about how the bidder has to resell it, and, you know, they're basically left with it or store it. I apologize. I'm not familiar with that element. If that is part of the program, I'm not familiar with that. That's it. Okay, thank you. Thank you very much. Can we call the next case, please?
judges: Tatel, Pillard, Edwards